UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN THE MATTER OF THE ARREST OF
JOHNNY MILNER, A.K.A. "BLAZE" AND
"O.G.," AND THE SEARCHES OF
TARGET PREMISES 1 THROUGH 5, THE
TARGET VEHICLE, AND THE TARGET
TELEPHONE (AS DEFINED HEREIN)

Case No. 3:23-MJ- 286 (TOF)

**Filed Under Seal**

**MASTER AFFIDAVIT**

I, Michael Caron, having been duly sworn, do hereby state:

**INTRODUCTION**

1.     I am a Detective with the Hartford Police Department ("HPD") and have been employed as a Hartford Police Officer since 2009.  My responsibilities as a Hartford Police officer include investigating and enforcing city and state criminal laws.  I am also currently assigned to the Northern Connecticut Gang Task Force, which is a Federal Bureau of Investigation (FBI) sponsored task force consisting of law enforcement agents from the FBI, and officers and detectives from the Hartford Police Department, East Hartford Police Department, West Hartford Police Department, New Britain Police Department, Connecticut Department of Correction and the Connecticut State Police.  The Task Force is dedicated to combating violent crime and firearms and narcotics violations in and affecting Hartford, Connecticut, and the surrounding areas.  As a member of the Task Force, I have been duly deputized as a Special Deputy United States Marshal and FBI Task Force Officer pursuant to 18 U.S.C. § 2510(7), which authorizes me to investigate violations of federal criminal law and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am also a "federal law enforcement officer" within the meaning of the Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      I attended the Hartford Police Academy in Hartford, Connecticut, where I received law enforcement training, to include firearms training, the execution of search and seizure warrants, investigative techniques, and legal instruction, which covered Fourth Amendment searches and seizures.  I have written and executed search warrants that have resulted in the seizure of illegal drugs and evidence of drug violations.  I have executed seizure warrants that have resulted in the seizure of assets acquired with drug proceeds and assets utilized to facilitate drug activities.

3.      During my career in law enforcement, I have participated in investigations involving the illegal distribution of controlled substances, firearms and gang related acts of violence to include homicides, shootings, robberies and home invasions. I have coordinated controlled purchases of illegal drugs and firearms utilizing confidential sources and cooperating witnesses.  I have written and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs, conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, and provided testimony in Federal and State Grand Jury proceedings. I have also interviewed admitted drug traffickers, drug users, gang members, informants and cooperating defendants, as well as local, state and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. I have supervised the activities of informants and cooperating witnesses who have provided information and assistance in the federal prosecution of drug offenders.

4.     I am one of the case agents who has directed the investigation that is the subject of this Affidavit in conjunction with law enforcement agents and officers, and I am thoroughly familiar with the information contained herein.

5.     One purpose of this Affidavit is to establish probable cause for an arrest warrant and criminal complaint charging **Johnny MILNER**, a.k.a. "Blaze" and "O.G." (DOB xx-xx-1977) with violations of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B) (Possession with the Intent to Distribute and Distribution of at least 40 grams of Fentanyl).

6.     This Affidavit is also submitted for the purpose of establishing probable cause for the issuance of warrants to search the following locations:

a.   The premises located at 281 Chestnut Street, 2nd Floor, New Britain, Connecticut ("**Target Premises 1**"), which is believed to be MILNER's current residence. The building is located on the south-west corner of Chestnut Street and Stanley Street and is a multifamily residence that is primarily grey in color. **Target Premises 1** can be accessed from a door on the Stanley Street side, which has the numbers "281" clearly written on the side of the doorway. The requested warrant would authorize the search of the premises described in Attachment A-1 for the evidence described in Attachment B.

b.   The premises located at 578 Prospect Avenue, Apartment 6, Hartford, Connecticut ("**Target Premises 2**"), which is believed to be a drug stash house used by MILNER. The building is located on the east side of Prospect Avenue between Farmington Avenue and Warrenton Street and is a multifamily residence that is primarily brown in color and has the numbers "578" clearly displayed on the front door. Apartment 6 is located on the first floor, north side, with a brown door with no apparent markings. The requested warrant would authorize the search of the premises described in Attachment A-2 for the evidence described in Attachment B.

c.   The premises located at 37 Center Street, Apartment 3A, Hartford, Connecticut ("**Target Premises 3**"), which is believed to be a drug stash house used by MILNER. The building is a multifamily residence located on the west side of Center Street, between Fairmount Street and Seyms Street. The building has a brick facade and has the number "37" clearly displayed on the front of the building, just left of the front common doorway. Apartment 3A is located on the third floor has the number "3A" displayed on the apartment door. The requested warrant would authorize the search of the premises described in Attachment A-3 for the evidence described in Attachment B.

3

    d.   The premises located at 18 Hillside Avenue, Hartford, Connecticut ("**Target Premises 4**"), a business establishment where MILNER conducts drug transactions. The premises is located on the east side of Hillside Avenue between Hamilton Street and Park Terrace. The business has a sign posted directly above the main entrance that reads "Pope Park Liquor Store." The requested warrant would authorize the search of the premises described in Attachment A-4 for the evidence described in Attachment B.

    e.   The premises located at 202 Bellevue Street, Apartment 202 C, Hartford, Connecticut ("**Target Premises 5**"), which is believed to be a drug stash house used by MILNER. The building is located on the east side of Bellevue Street between Pavilion Street and Battles Street and is a multi-family apartment complex that has a brick facade. Apartment 202 C is located on the north side of the third floor and has "202 C" clearly printed on the apartment door. The requested warrant would authorize the search of the premises described in Attachment A-5 for the evidence described in Attachment B.

    f.   A black 2015 Acura MDX with Vehicle Identification Number (VIN) 5FRYD4H49FB010136 ("**Target Vehicle**"). The **Target Vehicle** has been observed bearing Connecticut marker plate BH23353 and is used by MILNER to facilitate his drug trafficking activity. The requested warrant would authorize the search of the vehicle described in Attachment A-6 for the evidence described in Attachment B.

    g.   An iPhone 13 cellular phone assigned call number (959) 208-1997 and International Mobile Subscriber Identity (IMSI) number 310260252637973 ("**Target Telephone**"). This device is used by MILNER to facilitate his drug trafficking activity. The requested warrant would authorize the forensic examination of the device described in Attachment C for the purposes of identifying electronically stored information particularly described herein and in Attachment D.

    7.    As detailed herein, there is probable cause to believe that MILNER is using the **Target Premises** identified above to store drug proceeds and to store and process and facilitate the distribution of controlled substances, and that MILNER is using the **Target Vehicle** and the **Target Telephone** to facilitate his drug trafficking activity. For the reasons detailed herein, there is probable cause to believe that searches of the locations identified above will reveal evidence, contraband, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (Possession with the Intent to Distribute and Distribution of Controlled Substances), 846

(Conspiracy to Violate Federal Narcotics Laws), and 843(b) (Use of a Communications Facility to Facilitate Drug Trafficking Offenses) ("**Target Offenses**").

8.      Because this affidavit is submitted for the limited purposes set forth above, I have not included every fact known to me regarding this investigation.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrants.

## **PROBABLE CAUSE**

9.      Over the past few years, investigators from the Hartford Police Vice and Narcotics Unit, FBI, and DEA have all received information from numerous confidential informants, street sources, and cooperating defendants, all stating that Johnny MILNER is the main distributor of fentanyl to street level narcotics dealers in the "Sands" apartment complex located on Main Street in Hartford, CT. The majority of these sources also knew of at least two locations that MILNER was utilizing to stash and distribute his narcotics: 578 Prospect Avenue Hartford, Connecticut (the building of **Target Premises 2**); and 202 Bellevue Street Hartford, Connecticut (the building of **Target Premises 5**).

10.      During the months of January and February 2023, members of the FBI Gang Task Force began a narcotics investigation into an individual residing in East Hartford, CT. Based off source information, the target was utilizing their residence in East Hartford to distribute large quantities of fentanyl. Utilizing an FBI registered Confidential Human Source (herein "CHS"), several controlled narcotics purchases were conducted over the period of approximately two months.  The CHS would contact the target (who subsequently became a cooperating witness, herein referred to as "CW-1") via their identified cellular telephone number (the "CW-1 Phone Number," known to me) in order to plan and facilitate these controlled purchases. Both the CHS

and CW-1 have pending and/or anticipated criminal charges related to narcotics trafficking and are working with law enforcement in the hopes of receiving favorable consideration at sentencing.

### Search Warrant Execution – February 9, 2023

11.     On February 9, 2023, investigators executed a federal search warrant at CW-1's residence based on probable cause established through the controlled purchases discussed above. Before executing the warrant, investigators directed the CHS to contact CW-1 and order a larger than normal purchase of fentanyl (150 grams). The purpose of this was to force CW-1 to make a trip to meet with their source of supply in order to get the larger than normal requested quantity. Once investigators could confirm CW-1 had the product, the search and seizure would be executed on the target residence in East Hartford.

12.     CW-1 responded to the CHS, informing the CHS that s/he needed to go get the product and additional time was needed to make this happen. Surveillance was established at the target residence in East Hartford, and shortly thereafter, members of CW-1's family were observed leaving the residence and were subsequently by followed by investigators as they traveled into Hartford. Shortly after arriving in Hartford, surveillance lost visual on the vehicle CW-1's family was operating. Visual was lost for a number of hours.

13.     Later that evening, investigators were able to confirm that CW-1 and his/her family were able to obtain the agreed upon quantity of narcotics that was requested by the CHS, and investigators initiated the execution of the search at the target residence in East Hartford, CT. Pursuant to that search warrant execution, investigators recovered approximately 280 grams of fentanyl, along with cutting agent and street-level packaging (wax sleeves). CW-1 and two other family members were inside the residence.

14.     During a post Miranda interview, CW-1 stated that they were being supplied fentanyl from an individual they only knew as "OG."  CW-1 described "OG" as a black male, with dark complexion, in his 40s, who had a grey beard and frequently hung out at the liquor store on Hillside Avenue in Hartford near the Pope Park entrance.

15.     Based on recently developed information in other ongoing investigations and interactions with other confidential informants, I believed CW-1 was referring to MILNER.  A State of Connecticut DMV photo was immediately shown to CW-1, who affirmatively identified the individual depicted in the DMV photo as the individual they knew as "OG".  CW-1 further advised that s/he would contact MILNER via his cellular telephone number ending -1997 **(Target Telephone)** and that they would exclusively communicate through the "Facetime" function.

16.     Through my training and experience in this investigation and others, I know that narcotics dealers that are dealing with larger quantities of narcotics will, to thwart law enforcement, typically utilize means of communication other than traditional calls or text messages, such as Facetime, knowing that communications over these applications are more difficult for law enforcement to intercept by wiretap.

17.     CW-1 further advised s/he had met with MILNER just hours before law enforcement executed the search warrant at their residence, confirming the statements made to the CHS.  CW-1 stated that they contacted MILNER via the **Target Telephone** and was instructed to meet at the liquor store located on Hillside Avenue in Hartford, CT (18 Hillside Avenue Hartford, CT – **Target Premises 4**).

18.     CW-1 stated that once they arrived there, a third-party associate met with MILNER inside a black Infiniti sedan, later confirmed by investigators to be bearing Connecticut registration BA60708. This vehicle has previously been identified by investigators to be utilized and operated

7

by MILNER. The agreed-upon quantity of narcotics was then provided to CW-1 and associates. Investigators believe that the drugs may have been cut during the period when they lost visual on CW-1 and associates, which would explain the disparity between the 150 grams of fentanyl ordered and the 280 grams found at the residence.

19.      Subsequent to the above detailed debriefing of CW-1, investigators were able to independently corroborate the activity in the vicinity of **Target Premises 4** detailed by CW-1 through the review of stationary security cameras located in the immediate vicinity. A review of the security cameras revealed the following:

20.      At approximately 3:40 pm, a black Infiniti sedan bearing Connecticut BA60708 arrived and parked in the vicinity of **Target Premises 4**. Then, at 3:41 pm, a black male, whom I identified as MILNER based on a previous interaction with MILNER and a DMV photo, exited the Infiniti.  MILNER then walked over the passenger side of the vehicle and obtained some packages from the front passenger side and then walked towards the liquor store and out of view.

21.      At approximately 4:13 pm, MILNER and an unknown male (UM-1) returned to the same Infiniti parked on the roadway.  MILNER entered the operator's seat, while UM-1 entered the front passenger seat.

22.      At approximately 4:19 pm, a second unknown male (UM-2) emerged from the direction of **Target Premises 4** and entered the rear passenger seat of the Infiniti.  A short time later and at approximately 4:31 pm, investigators observed CW-1 arrive and park a few vehicles behind MILNER's identified black Infiniti.  At approximately 4:32 pm, an associate of CW-1 (identified below as "CW-2") entered the rear passenger seat of black Infiniti.  Shortly thereafter, and at 4:33 pm, the same associate of CW-1 exited the Infiniti and returned to CW-1's vehicle.

23.     Investigators obtained toll records associated with the **Target Telephone**. A review of those records indicated that the **Target Telephone** was in contact with the CW-1 Phone Number on the afternoon of February 9, 2023, at times consistent with the arranging of the apparent narcotics transaction described above.

24.     On February 17, 2023, Judge Richardson issued a search warrant authorizing the collection of historical and prospective cell phone location information from the **Target Telephone** for 30 days. Case No. 3:23-MJ-128.

**Controlled Purchase on February 21, 2023**

25.     On February 21, 2023, SA Carney and I met with CW-1 and another cooperating witness, "CW-2," who is working with law enforcement for financial compensation, for the purpose of having them contact MILNER on the **Target Telephone** in an attempt to purchase 100 grams of fentanyl from MILNER. CW-2 was provided with a recording device that has the ability to transmit live audio and video. During the meeting, CW-1 placed a Facetime call to MILNER. Via the audio and video transmitter, MILNER was observed answering the Facetime call and heard directing CW-1 to his liquor store located at 18 Hillside Avenue in Hartford, CT (**Target Premises 4**). SA Carney then provided CW-2 with $4,500.00 in FBI investigative funds for the purpose of purchasing 100 grams of fentanyl from MILNER.

26.     Shortly after the initial Facetime call to MILNER, I followed CW-1 and CW-2 from the secure meeting location directly to **Target Premises 4**. Via Hartford Police's "C4" video surveillance and the audio/video transmitter, CW-2 was observed entering **Target Premises 4**, while CW-1 remained in the vehicle. During this time, CW-2 was observed meeting with MILNER via the transmitting device. MILNER then instructed CW-2 to wait at the store while he walked out of the **Target Premises 4** and toward his vehicle (black Acura MDX bearing Connecticut

registration BH22353 – the **Target Vehicle**) that was parked on the roadway out front. This was captured via C4 video.

27.     MILNER entered the **Target Vehicle** and was followed by SA Medina and TFOs Moody and Pillai as he drove northbound on Park Terrace. Upon following MILNER to the area of Center Street and Seym Street, visual contact was lost for a moment. Visual contact was reestablished a couple minutes later by TFO Pillai, as the **Target Vehicle** was observed parked in the vicinity of 44 Center Street. A few minutes after that, SA Carney observed MILNER walking toward his vehicle from the area of 37-39 Center Street (**Target Premises 3**) with what appeared to be a food container in his hand. MILNER was observed entering the **Target Vehicle** and was followed directly back to **Target Premises 4** without stopping at any other location. MILNER was then observed exiting the **Target Vehicle** holding the same food container and entering the store via C4 video.

28.     MILNER reentered **Target Premises 4** and CW-2 was observed meeting with MILNER via the audio/video transmitter. A few seconds later, MILNER was observed handing CW-2 a clear knotted plastic bag that contained a blueish grey rock like substance. CW-2 then provided MILNER with the FBI investigative funds and proceeded to exit **Target Premises 4** immediately following the transaction. I then followed CW-1 and CW-2 directly back to the secure meeting location.

29.     Upon returning to the secure meeting location, CW-2 handed me a clear knotted plastic bag containing a blueish grey rock substance, which was later field tested, showing a positive reaction for the presence of fentanyl. The bag had an aggregate weight of approximately 100 grams.

30.     CW-2 stated that upon entering **Target Premises 4**, s/he met with MILNER who asked CW-2 to wait there while he left. MILNER was gone for approximately 20 minutes. During that time, CW-2 conversed with a female working inside the liquor store. The female identified herself as "Coca" (later positively identified as Natividad MENDEZ, DOB xx-xx-1976, by CW-2 and video from the recording device). MENDEZ stated that her nephew and kids are "Boobi, Stacks, and Boo" (investigators are familiar with these names as they were targeted during a federal wiretap investigation in 2014 for narcotics trafficking). MENDEZ further stated that MILNER was going to MENDEZ's house to grab the narcotics for CW-2 and to pick up shrimp for MENDEZ. MENDEZ explained that she lived only ten minutes away and that "OG" would be back shortly. Approximately 20 minutes after he left, MILNER returned with the agreed-upon narcotics and the shrimp, which was in a food container. CW-2 stated that upon receiving the narcotics, s/he provided MILNER with the investigative funds. Immediately following the transaction, CW-2 left **Target Premises 4**.

31.     Records obtained from Eversource for 37-39 Center Street (the area MILNER returned from with the food container, as investigators observed) showed that utilities for apartment 3A of 37 Center Street (**Target Premises 3**) are currently being billed to MENDEZ, indicating that **Target Premises 3** is likely the place where MILNER picked up narcotics to bring to CW-2.

### Surveillance of MILNER on March 1, 2023
### and the Identification of Target Premises 5

32.     On March 1, 2023, investigators were able to obtain License Plate Reader (LPR) information for the two vehicles that MILNER is known to operate, the Infiniti sedan bearing CT BA60709 and Acura MDX bearing CT BH22353 **(Target Vehicle).** Upon review of these results, it was determined that both of these vehicles had recently been parked in the driveway of 281-283

Chestnut Street in New Britain, Connecticut (building of **Target Premises 1**). In order to corroborate this information, physical surveillance was established at **Target Premises 1** shortly after 4:00 pm on this same date.

33.     **Target Premises 1** is believed to be MILNER's residence based on law enforcement observations of him there, information from confidential informants, and location data which has generally showed the **Target Telephone** to be in the vicinity of **Target Premises 1** overnight on most nights.

34.     During this time, I observed the **Target Vehicle** parked in the driveway of **Target Premises 1** (on the Stanley Street side). A moment later, investigators observed MILNER exit **Target Premises 1** from the side door (on Stanley Street, which provides access to the 2nd Floor) and enter the **Target Vehicle**.

35.     Investigators observed MILNER as he remained stationary in the **Target Vehicle** for a few minutes before he reversed out of the driveway and entered Route 9 northbound. Investigators did not follow MILNER after these observations.

36.     Subsequent to those observations, investigators obtained utility account information for **Target Premises 1**.  Eversource utilities were able to confirm that utilities account for **Target Premises 1** (281 Chestnut, 2nd Floor) were under the name Jahaida MARTINEZ (DOB xx/xx/1992). Connecticut DMV records indicated that MARTINEZ's listed address is 1574 Main Street, Apartment 3B, Hartford, CT. Other law enforcement databases indicated the same. A more recent DMV inquiry of MARTINEZ showed that her address is 281 Chestnut Street, New Britain, Connecticut, 2nd Floor (**Target Premises 1**).

37.     1574 Main Street, Apartment 3B, is located in the SANA apartment complex on Main Street in Hartford, Connecticut, which is commonly referred to as the "Sands." The street

view application available through "Google Maps" of 1574 Main Street shows a black Infiniti sedan, matching the appearance of MILNER's Infiniti but with an obscured license plate, parked directly in front of the apartment within the SANA apartment complex. According to Google, this photo was taken in January 2022.

38.     Carabetta Management, who owns and operates the SANA apartment Complex on Main Street in Hartford, Connecticut, advised investigators that a Shahyra GRANT is the current renter of 1574 Main Street Apt 3B, and that a Naim BROOKS is an unauthorized tenant that is residing there as well. Naim BROOKS is the brother of Lamel and Wali BROOKS, who are both known to the Hartford Police Department as narcotics dealers that distribute fentanyl out of the "SANDS" apartment complex and who have pending state arrest warrants for narcotics-related charges. Lamel BROOKS is suspected of being supplied narcotics by MILNER.

39.     Later in the evening of March 1, 2023, contemporaneous location information for the **Target Telephone** placed that device (and therefore likely MILNER as well) in the vicinity of Bellevue Street in Hartford. Shortly before 7:00 pm, I observed **Target Vehicle** parked directly in front of 202 Bellevue Street in Hartford (**Target Premises 5**). The **Target Vehicle** was running and appeared to be occupied by at least two individuals.

40.     Approximately 10 minutes later, investigators observed MILNER exit the **Target Vehicle** and meet with an unknown Hispanic male on the sidewalk and, based on my training and experience, engage in an apparent hand to hand narcotics transaction. It is unknown where this individual came from prior to the transaction, but after a brief meet, the Hispanic male was observed walking south on Bellevue Street and out of view. Approximately 5 minutes later, investigators observed another male (a black male wearing a dark grey sweater, possibly dark blue pants, average height and weight, and either bald or very short hair) exit the passenger side of the

**Target Vehicle**. Investigators observed the same black male enter 202 Bellevue (the building of **Target Premises 5**) while MILNER was observed driving off in the **Target Vehicle**. MILNER was not followed, as investigators maintained surveillance on 202 Bellevue.

41.     Shortly thereafter, and at the direction of investigators, Hartford Police Department uniformed Officers, Garten and Kearney, were requested to enter the common area of 202 Bellevue under the guise that Hartford Police had received a complaint of a possible "domestic incident" within the building. Officers were also directed to knock on several doors in an attempt to contact the occupants in the hopes of encountering the black male that had been seen parting company with MILNER and entering the building.

42.     When the uniformed officers exited the building, Officer Garten contacted me and stated that they had communicated with a black male who matched the description that was provided to him in apartment "202 C" (**Target Premises 5**) which was located on the third floor, north side. Officer Garten stated that they did not ask this individual for his name, but just asked generic questions pertaining to the fabricated story. Officer Garten stated that they could also hear a female yelling in the background within the apartment, but never saw her. It should be noted that Officers Garten and Kearney's body worn cameras were active during their interaction with this individual while they stood in the common hallway and spoke with this individual through the doorway. A still picture from the body worn camera was then sent to me.

43.     Utilizing law enforcement databases, investigators were able to obtain the name "James Jones," as a possible individual who resided at 202 Bellevue Street **(Target Premises 5)**. "James Jones" was then searched through Connecticut DMV records. During this time, a James JONES dob xx/xx/1981 was located, whose DMV photo resembled the individual depicted in photo obtained from the body worn camera. DMV and mugshot photos were sent to Officers

Garten and Kearney, who both believed that JONES was the individual they were speaking with from apartment 202 C.

44.      200-202 Bellevue Street is a three-story, 6-unit, apartment complex with two apartments on each floor. Based on HPD uniformed Officers gaining entry to the building, Officers were able to determine that 200 Bellevue Street had three apartments on the right (south) side of the building, while 202 Bellevue Street had three apartments on the left (north) side of building. Utilizing a law enforcement source, investigators were also able to obtain utility billing info for the building. "James Jones" was listed to be in apartment "B3." Per the source, all apartments for 200 Bellevue Street were listed as "A1, A2, A3," and all apartments listed for 202 Bellevue Street were listed as "B1, B2, B3." The source also reported that five of the six apartments were occupied, while one apartment was listed as vacant. Utilizing other law enforcement sources, investigators were unable to tie anyone listed for utilities at 200-202 Bellevue to MILNER, other than JONES.

45.      A database check revealed that JONES has prior convictions for narcotics offenses. Also, on March 5, 2023, DEA received an emailed complaint from a concerned citizen about 202 Bellevue. The compliant stated: "Ongoing selling of drugs by several people including Jimmy Jones dark skinned black man in early 40's. Drives black four door Infiniti. Drugs include marijuana and cocaine I had to move because of the activity." The report also stated that this activity was occurring on the third floor of 202 Bellevue. "202 C," where JONES resides, is the only apartment on the third floor of 202 Bellevue Street (accordingly, I believe "202 C" is the same unit as "B3" discussed above). The physical description provided by the concerned citizen also matches JONES, and law enforcement has observed JONES operating a four-door black Infiniti bearing Connecticut registration AY27370 on numerous occasions.

**Surveillance on March 13, 2023**

46.     At my direction, CW-1 attempted to contact MILNER on **Target Telephone** for the purposes of arranging a controlled purchase of fentanyl on the following dates: March 6th, March 8th, March 10th, and March 13th.  These contacts were attempted through the "Facetime" application as well as text message.

47.     On March 10, 2023, contact was made with MILNER over the **Target Telephone** and MILNER advised CW-1 via text message that he was "Dry waiting." Based on my training and experience, I understand "dry" is commonly used as a status by narcotics dealers that indicates they are out of product.  CW-1 responded via text: "Call me when it happens", to which MILNER replied via text "Yes".

48.     On March 13, 2023, CW-1 was again in contact with MILNER via text message over the **Target Telephone**.  The following is a summary of part of that conversation, which took place over several hours:

CW-1:  "Good afternoon can I see u today I really need to thank you."

MILNER: "Hopefully Tonight."

CW-1: "Okay thank you"

CW-1: "Heyyyyy anything yet let me please"

MILNER: "Checking on it now"

49.     Approximately one hour later, a review of location data for the **Target Telephone** revealed MILNER to be in the area of Windsor/ Windsor Locks, Connecticut for a period of approximately 20 minutes. At 10:57 pm, MILNER, utilizing the **Target Telephone** sent the following text to CW-1: "OK." Moments later, updated location information on the **Target Telephone** showed MILNER to be in the north end of Hartford, Connecticut.

50.     At approximately 11:15 pm, investigators established surveillance at 202 Bellevue Street in Hartford, CT **(Target Premises 5).** During this time, investigators observed the **Target Vehicle** parked on the west side of Bellevue Street, directly across the street from **Target Premises 5**. Sitting directly across from it on the east side of the street, was another black Acura MDX bearing Connecticut registration AW26743. This vehicle was running and had its lights on. Investigators have received information from sources, to include confidential informants, cooperating defendants, and street sources, all stating that MILNER's "brother" or "cousin" resides at this location and utilizes this location to store and distribute narcotics for MILNER.

51.     Investigators circled around the block quickly and upon return to this location, investigators observed that the **Target Vehicle** was gone and the other Acura MDX was in the process of driving away from its parked position. The Acura was followed by investigators as it made a right turn onto Battles Streets, then south on Windsor Street. The Acura was followed as it entered I-84 east bound and then entering Route 2. The Acura exited the highway via exit 5A off of I-84, at which time investigators broke off surveillance and returned back to Hartford.

52.     At approximately 11:34 pm, investigators drove by Center Street in Hartford in Connecticut and observed the **Target Vehicle** parked directly in front of **Target Premises 3** (where MILNER picked up the drugs for the February 21 controlled purchase and where Natividad MENDEZ is believed to reside).

53.     Shortly after, location information for the **Target Telephone** revealed that MILNER was in the vicinity of **Target Premises 4** (the liquor store at 18 Hillside Avenue). Believing that MILNER was just resupplied with a shipment of narcotics and would be contacting coconspirators including redistributors, investigators began to actively monitor pen register / trap and trace data that they had been receiving by court order for MILNER's identified Facebook

account (username "johnnyblazemilner"). During this time, the pen-trap data showed that MILNER's Facebook account was actively communicating with several individuals who are known narcotic dealers. Some of these individuals were arrested within the past year by members of Hartford Police Vice and Narcotics for narcotics-related crimes, while others are known to investigators from previous arrests for narcotic related crimes.

54.     Based on my training and experience, when larger-scale narcotics distributors receive a resupply of narcotics, they will often promptly divide that drug supply among multiple locations and/or multiple redistributors. This is commonly done for several reasons. For one, the distributor wants to monetize his resupply as quickly as possible, so it is important to resupply his redistributors quickly so they can process and sell that product on the street. Additionally, dividing a large supply over multiple locations reduces the risk that a single robbery or law enforcement seizure wipes out the distributor's business.  Through the totality of observations made through physical surveillance, location data for the **Target Telephone**, pen-trap data received from the **Target Telephone** and MILNER's Facebook account, and MILNER's communications with CW-1, I believe that on the evening of March 13, 2023, MILNER was resupplied with a shipment of narcotics and then spread those narcotics among **Target Premises 3** and **Target Premises 5,** as well as **Target Premises 2** which is discussed further below.

55.     As mentioned above, location data from the **Target Telephone** supports the belief that MILNER traveled to the aforementioned locations after being resupplied. Specifically, on the night of March 13, 2023, location data for the **Target Telephone** showed the device to be in the vicinity of Pigeon Hill Road and Addison Road in Windsor, CT, from 10:32 p.m. to 10:48 p.m.  From there, the **Target Telephone** traveled south along I-91, arriving in Hartford and specifically in the vicinity of 202 Bellevue Street **(Target Premises 5)** at approximately 10:58

p.m. until approximately 11:15 p.m.  From there, the **Target Telephone** arrived in the vicinity of 37 Center Street, Hartford, CT (**Target Premises 3**) at approximately 11:18 p.m.  At approximately 11:38 p.m., the location data indicated that MILNER's **Target Telephone** left the area of 37 Center Street and got on I-84 West.  At approximately 12:15 a.m. (March 14, 2023), MILNER's **Target Telephone** pings in the area of 578 Prospect Avenue, Hartford, CT (**Target Premises 2**).  MILNER's **Target Telephone** remains in this area until 12:36 a.m. (March 14, 2023), when it begins to travel south to New Britain, arriving in the area of 281 Chestnut Street, New Britain, CT (**Target Premises 1**), MILNER's suspected residence, at approximately 1:30 am on March 14, 2023.

### Controlled Purchase on March 15, 2023

56.     On March 15, 2023, I directed CW-1 to contact MILNER via the **Target Telephone** in an attempt to purchase 100 grams of fentanyl from MILNER. CW-1 placed a Facetime call to MILNER, who did not answer. CW-1 then sent a follow-up text message to the **Target Telephone** which stated: CHS: "Hey I really need to see you I waited for your call the other night but you never got back to me let me know something thank you." MILNER: "Got u. Hit u n sec."  The attempted Facetime call and the texts were not done in my presence, but CW-1 later showed me the record of the call and the texts, which confirmed those communications occurred.

57.     Surveillance was then established at MILNER's suspected residence located at 281 Chestnut Street in New Britain, CT (**Target Premises 1**). A few hours later, SA Carney observed MILNER exiting 281 Chestnut from the Stanley Street door with a black drawstring bag in hand. MILNER was then observed entering the **Target Vehicle** (bearing Connecticut registration BH22353), which was parked in the driveway of **Target Premises 1**. A few moments later, TFO

Kiely observed the **Target Vehicle** reversing out of the driveway and traveling toward Route 9. A short time later, CW-1 received a text message from the **Target Telephone** stating the following: "Getting it ready now."

58.     At this time, TFO Gallagher followed MILNER as he exited I-84 E via exit 44. MILNER was observed immediately pulling over and parking on the south curb line. Due to the flow of traffic and limited areas to pull over to maintain a visual, investigators following MILNER continued their route of travel. SA Carney immediately traveled around the block, returning to the area MILNER was last observed. MILNER appeared to have left the location.

59.     Visual contact was reestablished a short time later, as SA Carney and I observed MILNER walking to the rear of 578 Prospect Avenue (**Target Premises 2**). During this time, investigators could not immediately locate the **Target Vehicle**. A couple minutes later, the **Target Vehicle** was observed parked on North Beacon Street, just north of Farmington Avenue in Hartford, CT. This is approximately three city blocks from **Target Premises 2**.

60.     Approximately 20 minutes later, TFO Gallagher observed MILNER exiting the rear door of **Target Premises 2** with the same black drawstring bag in his hand. MILNER was observed walking northbound and arriving at the **Target Vehicle** on North Beacon Street a few minutes later.

61.     MILNER was followed out of the area, and he began to make several turns, which, based on my training and experience, was a countersurveillance tactic MILNER was employing to make sure he was not being followed. A short time later, MILNER was observed arriving at the liquor store located at 18 Hillside Avenue (**Target Premises 4**). Via C4 video, MILNER was observed retrieving boxes of unknown goods from the **Target Vehicle** and bringing them inside

**Target Premises 4**. MILNER returned to **Target Vehicle** and retrieved the black drawstring bag and brought that inside **Target Premises 4**.

62.     During this time, I met with CW-1 and CW-2 at a secure meeting location. CW-2 was then provided with a recording device that has the ability to transmit live audio and video. Additionally, CW-2 was provided with $4,500.00 in FBI investigative funds for the purpose of purchasing 100 grams of fentanyl from MILNER. CW-1 and CW-2 were then followed from the secure meeting location directly to **Target Premises 4**.

63.     Via C4 video, CW-1 and CW-2 were observed arriving at **Target Premises 4** on Hillside Avenue. CW-2 was observed entering **Target Premises 4** and meeting with MILNER via an audio/video transmitter. Via the transmitter, I observed the same pants and boots MILNER had previously been seen wearing throughout the day. Via C4 video, CW-2 was observed exiting **Target Premises 4** and returning to their vehicle. I then followed CW-1 and CW-2 back to the secure meeting location.

64.     At the secure meeting location, CW-2 handed me a clear zip lock plastic bag containing a large greyish rock like substance which I immediately recognized to be consistent with fentanyl. A NARK II field test was later conducted on a piece of the substance, showing a positive reaction for the presence of fentanyl. The bag had an aggregate weight of approximately 103 grams.

65.     CW-2 stated that upon entering **Target Premises 4**, s/he met with MILNER toward the rear of the store. During this time, CW-2 provided MILNER with the FBI investigative funds in return for the agreed-upon narcotics. MILNER also asked CW-2 how much CW-2 needed, making CW-2 believe that there were additional narcotics in the store. CW-2 stated that MILNER

retrieved the narcotics from a box that was next to a microwave. Immediately following the transaction, CW-2 left the store and proceeded back to the secure meeting location.

**Target Telephone Location Data from March 26, 2023**

66.    On March, 22, 2023, Judge Farrish issued a search warrant authorizing the collection of historical and prospective cell phone location information from the **Target Telephone** for an additional 30 days. Case No. 3:23-MJ-244.

67.    From around March 23 to March 26, 2023, location data for **Target Telephone** showed that MILNER was in Orlando, Florida. To get a possible return date for MILNER, I directed CW-1 to contact MILNER on **Target Telephone** via text message. The following are text messages between CW-1 and MILNER from March 26, 2023 at approximately 7:01 p.m.:

CW-1: Happy Sunday Hey I need to see you soon

MILNER: Ok just got in from Florida

MILNER: I'm ready

68.    Further review of recent location data for the **Target Telephone** confirmed that MILNER was back in Connecticut as of approximately 5:30 p.m. on the evening of March 26, 2023. The data showed that MILNER arrived back in New Britain, Connecticut for a short period of time, before returning to Hartford, Connecticut. Furthermore, just after the conversation CW-1, the location data showed that MILNER was in the vicinity of the following locations at the indicated approximate times:

7:30 p.m.: In the vicinity of **Target Premises 5** (202 Bellevue Street Hartford, Connecticut).

8:45 p.m.: In the vicinity of **Target Premises 2** (578 Prospect Avenue Hartford, Connecticut).

9:06 p.m.: In the vicinity of **Target Premises 3** (37 Center Street Hartford, Connecticut).

69.     Review of the pen-trap data from MILNER's Facebook account showed that, as was the case on March 13 when MILNER appeared to have been resupplied, the night of March 26 MILNER was actively in communication with several individuals who are suspected of distributing narcotics. One of these individuals, with Facebook user name "Junior Love," was in contact with MILNER on both dates MILNER was believed to be distributing narcotics. This individual has been positively identified as Collin BOURNE, date of birth xx-xx-1989. Bourne was recently arrested by members of the Hartford Police Vice and Narcotics Unit for narcotics related crimes when he and the son of Natividad MENDEZ, Angel ROSA date of birth xx-xx-1994, were actively selling narcotics on Huntington Street in Hartford, Connecticut.

70.     Based on my training experience as set forth above, and based on similar location data and Facebook activity observed on March 13, I believe MILNER was once again distributing narcotics among his coconspirators and among **Target Premises 2**, **Target Premises 3**, and **Target Premises 5**.

### Historical Investigative Information Related to MILNER Obtained from DEA

71.     Members of the DEA recently provided me and other investigators with the following historical information about MILNER: In the summer and fall of 2021, the DEA was using a confidential source to purchase gram quantities of fentanyl from MILNER. During their investigation, the DEA determined that MILNER was utilizing **Target Premises 2** to distribute fentanyl from. Specifically, in November 2020, after conducting a controlled purchase from MILNER, DEA investigators maintained surveillance on 578 Prospect to ensure MILNER did not leave the building. An undercover agent (UC) conducted a food delivery ruse to confirm MILNER that MILNER occupied, as reported by confidential sources, an unmarked first floor apartment (Apartment 6). The UC was granted entry into the common hallway and immediately knocked on

unmarked brown wooden door, located on the left side of the hallway. The UC announced that he/she had a food delivery for the occupants of said residence. A voice from the other side of the door advised that they had not ordered any food. Based on previous audio/video surveillance operations, the UC identified the voice heard on the other side of the door as MILNER's voice.

72.     A recent check of FBI databases for "578 Prospect" Hartford, Connecticut, yielded a December 2022 report from Experian which associated a landline telephone with "Johnny Milner" at 578 Prospect Avenue, Apt 6, Hartford, CT (**Target Premises 2**).

73.     Furthermore, while conducting surveillance on July 14, 2021, the DEA observed MILNER congregating with several other individuals in the area of 202 Bellevue Street (**Target Premises 5**). During this time, DEA investigators observed MILNER exit 202 Bellevue Street with a reusable Wal-Mart bag and enter the passenger seat of an Acura that had just arrived. Moments later, MILNER exited the Acura without the Wal-Mart bag, but instead holding a black backpack. MILNER then reentered 202 Bellevue Street. The Acura was then followed out of the area and a motor vehicle stop was conducted a short time later. In the Acura, DEA investigators found the Wal-Mart bag that MILNER had been observed with. Inside the bag was US currency totaling $141,030.00. This money was seized as suspected proceeds from illegal narcotics sales. MILNER was not arrested as part of this investigation.

### Drug Traffickers' Use of Residences and Other Properties for Drug Trafficking Purposes

74.     During my tenure as a law enforcement officer, I have investigated and participated in numerous operations which involved, in part, drug trafficking violations, the flow of the illegal proceeds obtained from drug trafficking, and related offenses such as violations of firearms laws. My involvement in these investigations has resulted in the successful prosecution of numerous individuals and the forfeiture of assets purchased with the proceeds from unlawful drug trafficking,

as well as assets used to facilitate these violations.  Search warrants relating to these investigations have covered vehicles, residences of drug traffickers and their co-conspirators, "stash houses" used as storage and distribution points for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

75.     Materials searched for and recovered in these locations have included various controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, records reflecting the names, addresses, and telephone numbers of co-conspirators, sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; wireless telephones, paging devices, computers and computer disks, answering machines; and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking.  These items obtained by search warrants, constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

76.     Based on my training, experience, and participation in this and other drug trafficking investigations, I know that:

      a.   drug traffickers often place assets in the names other than their own to avoid detection of these assets by law enforcement;

      b.   drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

      c.   even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.   drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business;

e.   drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

f.   drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore the above mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

g.   drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

h.   drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates;

i.   drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions. However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts;

j.   drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

k.   drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

l.  drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

m.  persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

n.  drug traffickers often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds.  These photographs and video movies are normally in the drug traffickers possession or residence;

o.  the State of Connecticut is generally viewed as a consumer state in regards to narcotic activity.  However, it is common for drug traffickers to travel to major distribution centers such as New York to purchase their narcotics for distribution.  It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers.  It is known that drug traffickers' methods include, but are not limited to:  commercial airlines, private motor vehicles, tractor trailer units, public transportation, and motor vehicles with concealed compartments, and government and contract mail carriers.  It is known that the residences of drug traffickers will often contain records of drug related travel.  These records may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

p.  based on my training and experience, drug traffickers commonly have firearms, ammunition and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to handguns, rifles, shotguns, automatic weapons, knives, ammunition, and magazines. These firearms and weapons are most often kept to protect and secure drug traffickers' property;

q.  based on my training, experience and participation in this and other drug trafficking investigations, I know that it is generally a common practice for drug traffickers to store their drug inventory and drug related paraphernalia in their residences, cars or those of trusted associates.  This paraphernalia frequently includes scales, funnels, sifters, grinders, plastic bags, heat sealing devices, and dilutants;

r.  based on my training and experience, drug dealers often create secret locations, commonly called "traps" or "hides" in their automobiles and residences.  Often, drug dealers will use these traps or hides to conceal and

store narcotics, weapons, money and other items and documents related to their drug trade; and

s.   based on my training, experience and participation in this and other drug trafficking investigations, I know that drug traffickers often possess, maintain and control other items related to their drug trafficking activities, as described in Attachment A to this affidavit, in their cars, homes, garages and out-buildings.

77.   Based on the information set forth herein, I believe that MILNER is using the Target Premises to conduct his drug business and that evidence of his drug trafficking crimes will be found at those locations. **Target Premises 1** is MILNER's residence and therefore most likely contains drug proceeds, records of drug trafficking like cell phones, and other evidence. Specifically, with respect to proceeds, this likely includes cash and valuables like jewelry (based on my training and experience, drug dealers do not and cannot use bank accounts; they maintain their ill-gotten gains in cash and valuables). As discussed above, MILNER was observed leaving **Target Premises 1** with a black drawstring bag the day of the March 15 controlled buy and was observed carrying that bag at other locations during the day. After investigators observed the bag on March 15, they asked CW-2 if he/she had seen it during the transaction; CW-2 said no but that MILNER "always" has the bag and that CW-2 has observed MILNER place drug proceeds in the bag before, as well as remove drugs from the bag (in prior interactions). Attempts to follow MILNER directly back to **Target Premises 1** after his drug trafficking activities have been futile due to his countersurveillance techniques. After the February 21 controlled buy, investigators followed MILNER for approximately 30 minutes, while he made numerous random and inexplicable turns, and they ultimately terminated surveillance. When investigators observed him engage in similar tactics following the March 15 controlled buy, investigators quickly terminated surveillance to avoid detection. However, as noted herein, location data from MILNER's **Target Telephone** shows him staying overnight at **Target Premises 1** most nights, and he was seen

leaving there with his black drawstring bag the day of the March 15 controlled buy, indicating he likely keeps the bag (and the proceeds he is known to store in it) at **Target Premises 1**. Besides proceeds, the **Target Telephone**'s location data places it in the vicinity of **Target Premises 1** most nights, so it will likely be found there when the warrant is executed early in the morning. Additional cell phones, which as discussed herein would likely contain evidence of MILNER's locations and contacts and drug-related communications, are also likely to be found at **Target Premises 1**, as these phones are, among other things, repositories of drug customer contact information and therefore valuable items that drug dealers keep. Additionally, MILNER was observed on video recordings of the drug transactions described herein. The clothing he was observed wearing in these videos is likely stored at his residence, where most people store their clothing, and that clothing is evidence that MILNER is the person in the recordings and thus evidence of the Target Offenses. Also, **Target Premises 1** is likely to contain evidence of ownership of the **Target Vehicle** and MILNER's black Infiniti, such as the titles; because those vehicles were used to facilitate drug trafficking, evidence that MILNER owns them is evidence of the Target Offenses. Finally, based on my training and experience, I know that drug traffickers, particularly traffickers in the quantities of drugs MILNER is dealing in, are often the target of robberies because they carry valuable product and cash and generally cannot report robberies to the police. Accordingly, drug traffickers frequently carry firearms to protect themselves. MILNER is trafficking large quantities of narcotics (and cash resulting from narcotics transactions) in the most dangerous areas of Hartford. It is likely that he carries a firearm with him while doing so, and that he brings the firearm home at night to continue protecting himself, rather than leaving his means of protection elsewhere and unattended. It is also notable that **Target Premises 1** is in New Britain, far from the other Target Premises where MILNER engages in drug trafficking, which

makes it more likely that **Target Premises 1** is being used to store proceeds and other valuables, while the other premises store drugs (in my training and experience, drug dealers at MILNER's level do not store drugs and proceeds together long term).

78.     **Target Premises 2**, **Target Premises 3**, and **Target Premises 5** are likely stash locations given MILNER's observed travel there during the controlled buys and during other surveillance of suspected drug trafficking activities, and based on observed location data for the **Target Telephone** showing him traveling in succession to those locations after two apparent resupplies, as detailed above. And **Target Premises 4**, the liquor store, is a location where MILNER has been observed conducting drug transactions (both controlled buys); he also made a statement during the second controlled buy suggesting that he stored narcotics there. Based on the information herein and my training and experience, I believe that MILNER likely stores smaller amounts of narcotics at the liquor store in anticipation of conducting transactions like the controlled purchases. The liquor store is a more secure location than transacting in public, and safer than bringing customers to MILNER's personal residence or his stash houses.

**Additional Information About Cell Phone Use**

79.     With regard to the **Target Telephone**, I request permission to enter and search the device for evidence relating to the Target Offenses, including evidence of communications between and among MILNER and/or other co-conspirators involved in the Target Offenses.  Based on my training and experience, and as set forth in this affidavit, I believe that MILNER has used and continues to use the **Target Telephone** to facilitate the distribution of controlled substances. Furthermore, based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of internet searches for locations and addresses of businesses associated with criminal activity such as locations used to conceal or secure evidence, as well as

renting or leasing vehicles used by co-conspirators to commit the Target Offenses.  Internet browsing history could also identify the user of the **Target Telephone** based on the website and locations they access.  Also based on my training and experience, wireless phones may contain videos and images of coconspirators, their possession of evidence associated with the Target Offenses, weapons and tools used to commit the Target Offenses, locations visited by MILNER, and other co-conspirators, before, during, and after the crimes committed.  I also know that such images or videos might be stamped with a date and time, as well geolocation data, that would assist investigators in establishing a timeline and locations relevant to the Target Offenses.  I also know based on my experience and training that some wireless phones are equipped with GPS data, which would also show locations relevant to MILNER's commission of the Target Offenses.

80.    Based upon my training and experience, I am familiar with the manner and means employed by narcotics traffickers, including the manner and means by which narcotics traffickers communicate, and those methods employed by narcotics traffickers to avoid detection by law enforcement.

81.    From my training and experience, I know that narcotics traffickers often use wireless telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that by doing so they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs, guns and/or other assets.  I also know that such individuals often frequently "drop" or "change" their cellular telephones, i.e. terminate usage of one cellular telephone and begin usage of a new cellular telephone, in an attempt to thwart the efforts of law enforcement, and often possess and use multiple cellular telephones interchangeably for the same reason.  Furthermore, I know that drug traffickers and the couriers and transporters that work for sources of supply often compartmentalize operations by using different phones to

communicate with different re-distributors so that if one part of the distribution operation is compromised by law enforcement, other aspects of the operation remain intact.  The use of multiple cell phones at the same time is one way to achieve such compartmentalization.  I and other law enforcement officers that I have work within drug investigations have had the opportunity to obtain search warrants for cell phones in the past.  The execution of these search warrants has resulted in the recovery of, among things, text messages, photographs, WhatsApp messages, Facebook messages, and phone contacts that have constituted evidence of drug trafficking.

82.     The **Target Telephone** is a smartphone. I know that most smartphones retain data including, but not limited to, Bluetooth data, Wi-Fi connectivity data, contacts, text messages, voicemails, and GPS location data.  There is probable cause to believe, and I do believe, that location information stored on the **Target Telephone** may reveal the location of co-conspirators, stash house locations, and a pattern of life of participants in the drug trafficking activity being investigated here.

83.     I know that most phones enable location services which allow carriers and third-party application and websites to gather and use information based on the current location of the phone to provide a variety of location-based services.  Location services associated with the phone use GPS and Bluetooth (where available) along with crowd-sourced Wi-Fi hotspot and cell tower locations to determine the device's approximate location.  There is probable cause to believe, and I do believe, that location information stored on the Target Cell Phones may reveal the location of co-conspirators, stash house locations, and a pattern of life of participants in the drug trafficking activity being investigated here.

84.     Based on my training and experience and discussions with other investigators, it is known that persons who smuggle and transport illegal narcotics frequently use cell phones to maintain contact with co-conspirators during travel and also use cell phones to contact persons where the drugs are destined. This frequently occurs due to the transient nature of these smuggling operations and because members of these conspiracies frequently travel and require coordination of their movements in order to pick up and drop off drugs at designated times and places.

85.     Based on my training and experience, and consultation with, and information from other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know the following information tends to exist on wireless telephones, including wireless telephones utilized by those engaged in narcotics trafficking activities:

    a.  the telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device/s;

    b.  call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

    c.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

    d.  records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

    e.  information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

    f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

    g.  saved searches, locations, and route history in the memory of said device/s; and

h.  internet browsing history, to include, internet searches in the memory of said devices.

**Electronic Storage and Forensic Analysis of the Target Telephone**

86.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

87.     *Forensic evidence.*  As further described in Attachment D, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Telephone** was used, the purpose of their use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Target Telephone** because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  I know that when an individual uses an electronic device to communicate about drug trafficking activity and to arrange narcotics transactions, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

88.    *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Target Telephone** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

89.    Searching for the evidence described in Attachment D may require a range of data analysis techniques.  In some cases, agents and analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information.  These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment D, or perusing all stored information briefly to determine

whether it falls within the scope of the warrant.  In light of these difficulties, the FBI intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment D.

## CONCLUSION

90.     On the basis of the foregoing information, I request that the Court issue an arrest warrant for Johnny MILNER and a criminal complaint charging him with:

(I)     Possession with intent to distribute and distribution of 40 grams or more of a mixture and substance containing fentanyl on February 21, 2023, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vi); and

(II)    Possession with intent to distribute and distribution of 40 grams or more of a mixture and substance containing fentanyl on March 15, 2023, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vi).

91.     I also request that the Court issue the proposed search warrants.

Respectfully submitted,

Michael Caron  Digitally signed by Michael Caron
Date: 2023.03.28 18:11:03 -04'00'

Michael Caron
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me by telephone
on March 28, 2023, in Hartford, Connecticut.

Date: 2023.03.28
19:03:04 -04'00'

HON. THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### Property To Be Searched

The premises located at 281 Chestnut Street, 2nd Floor, New Britain, Connecticut. The building is located on the south-west corner of Chestnut Street and Stanley Street and is a multifamily residence that is primarily grey in color. The 2nd floor can be accessed from a door on the Stanley Street side, which has the numbers "281" clearly written on the side of the doorway.



## ATTACHMENT A-2

### Property To Be Searched

The premises located at 578 Prospect Avenue, Apartment 6, Hartford, Connecticut. The building is located on the east side of Prospect Avenue between Farmington Avenue and Warrenton Street and is a multifamily residence that is primarily brown in color and has the numbers "578" clearly displayed on the front door. Apartment 6 is located on the first floor, north side, with a brown door with no apparent markings.



## <u>ATTACHMENT A-3</u>

### Property To Be Searched

The premises located at 37 Center Street, Apartment 3A, Hartford, Connecticut. The building is a multifamily residence located on the west side of Center Street, between Fairmount Street and Seyms Street. The building has a brick facade and has the number "37" clearly displayed on the front of the building, just left of the front common doorway. Apartment 3A is located on the third floor has the number "3A" displayed on the apartment door.



## <u>ATTACHMENT A-4</u>

### Property To Be Searched

The premises located at 18 Hillside Avenue, Hartford, Connecticut, a business establishment located on the east side of Hillside Avenue between Hamilton Street and Park Terrace. The business has a sign posted directly above the main entrance that reads "Pope Park Liquor Store."



## <u>ATTACHMENT A-5</u>

**Property To Be Searched**

     The premises located at 202 Bellevue Street, Apartment 202 C, Hartford, Connecticut. The building is located on the east side of Bellevue Street between Pavilion Street and Battles Street and is a multi-family apartment complex that has a brick facade. Apartment 202 C is located on the north side of the third floor and has "202 C" clearly printed on the apartment door.



## **ATTACHMENT A-6**

**Property To Be Searched**

A black 2015 Acura MDX with Vehicle Identification Number (VIN) 5FRYD4H49FB010136, believed to be located in the District of Connecticut.

## ATTACHMENT B

### Particular Things to be Seized

All evidence, contraband, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute and Distribution of Controlled Substances), 846 (Conspiracy to Violate Federal Narcotics Laws), and 843(b) (Use of a Communications Facility to Facilitate Drug Trafficking Offenses), to include the following as they relate to the above-listed offenses:

a.  Controlled substances;

b.  Residue of controlled substances;

c.  Cell phones (*these items if located would be seized only, and if probable cause existed to search the contents, a separate warrant would be sought*);

d.  Paraphernalia and equipment for packaging, processing, diluting, cutting, weighing, and distributing controlled substances, for example: packaging material, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, as well as cutting agents and other substances used to process, dilute or cut controlled substances;

e.  Any books, records, receipts, notes, ledgers, journals, travel documents and other papers relating to the purchase and distribution of controlled substances;

f.  Bank statements, tax records, financial statements and records, safe deposit keys, storage unit keys, receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles, boats, jet-skis, snowmobiles, motorcycles and all-terrain vehicles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances.

g.  United States currency, stocks, bonds, certificates of deposit, any other financial instruments, money counters, and the contents of any safes or other security type boxes or locked boxes and containers, including any jewelry, precious metals and gems, such as gold, silver and diamonds evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

h.  Photographs of people, assets, or objects that may be related to the purchase and distribution of controlled substances;

i.  Personal effects tending to establish proprietary interest, including but not limited to, personal identification, driver's licenses, vehicle registration certificates, passports, birth certificates and deeds;

j.       Records of travel in furtherance of the unlawful distribution of drugs;

k.      Records of any communications relating to drug trafficking; and

l.       Firearms, ammunition and other weapons and destructive devices.

## ATTACHMENT C

### Property To Be Searched

An iPhone 13 cellular phone assigned call number (959) 208-1997 and International Mobile Subscriber Identity (IMSI) number 310260252637973, which is serviced by T-Mobile with an unknown subscriber, and is believed to be located in the District of Connecticut and used by Johnny MILNER ("**Target Telephone**").

This warrant authorizes the forensic examination of the Target Telephone for the purpose of identifying the electronically stored information described in Attachment D.

## ATTACHMENT D

### Particular Things to be Seized

All records and information on the Target Telephone that relate to violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute and Distribution of Controlled Substances), 846 (Conspiracy to Violate Federal Narcotics Laws), and 843(b) (Use of a Communications Facility to Further Drug Trafficking Offenses), to include the following as they relate to the above-listed offenses:

1. the telephone number, ESN number, serial number, and SIM card number of the telephone;

2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the telephone;

3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, violations of 21 U.S.C. §§ 841(a)(1) and 846 and 843(b);

4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;

5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7. saved searches, locations, and route history in the memory of said telephone;

8. internet browsing history, to include, internet searches in the memory of the telephone;

9. images and videos in the memory of the telephone; and

10. evidence of user attribution showing who used or owned the telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device(s).

To the extent that the telephone contains removable storage media and/or other devices, examination of such removable media and/or devices is specifically authorized for the same evidence as described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.